PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____


No. 10-4339
_____


LAUREEN BULL,
                              Appellant


v.


UNITED PARCEL SERVICE, INC.
_____


On Appeal from the United States District Court
for the District of New Jersey

(D.C. No. 2-07-cv-02291 )
District Judge:  The Honorable Dennis M. Cavanaugh

ARGUED SEPTEMBER 15, 2011

BEFORE:  SLOVITER, SMITH, and NYGAARD,
*Circuit Judges*


(Filed:  January 4, 2012)

David Zatuchni, Esq. [Argued]
Zatuchni & Associates
287 South Main Street
Lambertville, NJ 08530
    *Counsel for Appellant*

Michael T. Bissinger, Esq.[Argued]
Day Pitney
One Jefferson Road
Parsippany, NJ 07054-2891
    *Counsel for Appellee*

_____

## OPINION OF THE COURT
_____

NYGAARD, *Circuit Judge*

After declaring a mistrial, the District Court dismissed Laureen Bull's state-law employment discrimination case as a sanction for failing to produce originals of certain medical notes requested by United Parcel Service. Bull maintains that the District Court abused its discretion by ordering this sanction. We agree and will reverse and remand for retrial.

I.

A.

Our review is fact-intensive. However, the basic contours of the case can be summarized as follows. Bull, a

2

part-time employee since 1986, injured her neck and shoulder on the job in late December 2005. Though she promptly reported the incident and requested medical attention the following day, there was a two-week delay before she had access to a company doctor. She also alleges a number of instances in which her supervisors ignored, downplayed and misrepresented her injury to superiors.

The company doctor diagnosed her with contusions and strains to her shoulder and neck, and restricted her lifting to twenty-five pounds. She was referred to an orthopedic specialist who lowered the lifting restriction to twenty pounds. She was also given physical therapy for approximately two months. UPS placed her on a temporary work assignment that did not involve lifting, but at the end of the 29-day assignment she stopped working and began receiving workers' compensation. On March 29, 2006, the orthopedic specialist opined that—though Bull was only 70 percent recovered—she had reached maximum medical improvement. The doctor restricted her overhead lifting to 10 pounds, but did not mention other types of lifting.

Bull returned to work and presented the specialist's note. She received a new work assignment, but after five days her new supervisor told her that her medical restrictions made it impossible for UPS to continue assigning work to her. UPS advised her to seek permanent disability.

B.

Bull wished to be reinstated and asked her union representative for help. The representative advised her to get a second opinion from her own doctor. Through her doctor's

3

referral, another orthopedic specialist, Dr. Farber, examined her on June 13, 2006. Farber gave her a note that said among other things: "patient is capable of lifting 50 pounds or more." D.C. No. 2-07-cv-02291, ECF No. 18-14, 10. The collective bargaining agreement requires that employees be capable of lifting 70 pounds. Bull faxed the note to the union representative who, in turn, faxed it to UPS. UPS, however, found numerous inconsistencies with the note, and told this to the union representative.[1] Bull's union representative then advised Bull to get another note, and to get more information to satisfy UPS's issues. Bull called Dr. Farber's office and requested another note. She then faxed a second note from Dr. Farber's office, dated August 14, 2006. UPS also found multiple problems with the second note.[2] These two notes from Dr. Farber's office have become central to this appeal.

---

[1] UPS found that the Farber note, dated June 13, 2006, listed conflicting dates and provided contradictory answers on whether the medical condition was work related. Moreover, the note ambiguously stated that Bull could lift "50 pounds or more." UPS also deemed other portions of the note as illegible and observed that part of the note was cut off. ECF No. 18-1, 14-15.

[2] UPS asserts that the August 14, 2006 Farber note had numerous problems, including: inconsistent dates; a signature differs from the June note; inconsistent answers on the issue of whether the medical condition was work-related; and, an ambiguous instruction that "Patient is not able to lift over 70 pounds." The note was also cut off at the bottom. Finally, there were portions of the note that were illegible. ECF No. 18-1, 16-19.

4

On September 27, 2006, UPS sent a letter to Bull's union representative, saying in part:

> As you know, we received two notes from Dr. Farber's office regarding Ms. Bull's ability to return to work; both notes (dated June 13, 2006 and August 14, 2006) indicate restricted duty. . . . The Company also requests that Ms. Bull produce the original notes from Dr. Farber's office due to the fact that the notes received to date are blurry and in some cases illegible.

ECF No. 18-15, 9. The representative contacted Bull, and requested again a new doctor's note and more information. Bull never responded. Instead, she filed a Workers' Compensation lawsuit and contacted the Equal Opportunity Employment Commission. She then filed the instant claim in April 2007. During discovery, Bull turned over new copies of the Farber notes to UPS in response to their general discovery requests.

## C.

At the March 2010 trial, during Bull's direct examination, her counsel sought to introduce copies of the June 13, 2006 note from Dr. Farber. UPS objected on the basis of best evidence. During the sidebar that followed, the District Court asked Bull's attorney where the original June 13, 2006 note from Dr. Farber was. He responded: "we don't

5

have - - it doesn't exist any more. All we have is a copy." ECF No. 56-4, 21:24-25. He also pointed out that Dr. Farber had authenticated the note. UPS responded that they had "documented letters asking for the originals," and that, during this litigation, "we have asked for the originals, and we have never seen them." *Id.* at 23:4-5, 23:18-19. The District Court ultimately decided to overrule UPS's objections, concluding that the argument against admission went to the weight of the evidence, rather than its authenticity.

Moments later, as Bull's counsel was about to request that the note be admitted into evidence, the District Court interrupted and said to Bull in open court: "Well, before we do that: Where's the original of this note?" She answered: "The original note is in my home. . . ." *Id.* at 28:6. Surprised by his client's response, Bull's counsel immediately said:

> Your honor, I understand what she just said. I've been asking her for the originals since the very beginning when Mr. Bissinger [UPS's counsel] has been asking me for the originals. She just kept telling me that she doesn't have them, she's looked for them but she doesn't - - can't find those notes anymore, they don't exist any more.[3]

---

[3] In an affidavit accompanying Bull's response to UPS's motion for sanctions, counsel revisits this statement. He says: "When queried as to original Farber medical notes, Ms. Bull indicated that she was unable to locate them and believed

*Id*. at 28:12-17.  A few moments later, after a brief sidebar, Bull's attorney sought to clarify her statement.  The following exchange occurred in open court.

> Q.    Laureen, I understood – have you looked for the original?  Have you actually been able to find the original note?
>
> A.    I have looked for the original note.  Many things going on in my life with the paperwork, and the sale—got damage to my apartment. I can try to find this note.

---

they may have been lost due to flooding in her home."  ECF No. 58-1, 2.  He, then, goes on to say:  "The Court should be aware that this is undersigned counsel's recollection of what transpired in 2007, but not Ms. Bull's.  Ms. Bull has recently advised her counsel that she does not recall being asked by undersigned for the original Farber medical notes and that she would have conducted a search for these documents back in 2007 is [sic] she had been required to do so."  *Id.*  Moreover, at oral argument, Bull's counsel stated emphatically that Bull did not lie about possessing these documents.  Therefore, without a finding by the District Court, or indeed any testimony from Bull on this topic, we can neither speculate upon what Bull understood or intended with regard to the production of the Farber note originals, nor whether her responses were credible.

7

> Q. Have I asked you to look for the original?
>
> The Court: Well, wait a minute. Wait a minute. In response to my question, you said the original was at your home. There was no hesitation.
>
> The Witness: Correct.
>
> The Court: Is the original of that note at your home?
>
> The Witness: It should be.
>
> The Court: As your attorney stated, this case has been going on for years. There were years of discovery. This note was asked for. Is there some reason - - have you made a search for it previously?
>
> The Witness: No, sir.

*Id.* at 30:3-21. In the sidebar that followed, the District Court questioned counsel for Bull and UPS on the appropriate response to this revelation. UPS advocated excluding the originals and any copies other than those originally faxed to them by the union, specifically requesting that the jury be permitted to see only the document presented to UPS. The District Court brushed aside UPS's suggestions and instead

8

decided to declare a mistrial and invited UPS to file a motion for sanctions.

Bull sent the original June 13 and August 14 notes from Dr. Farber to the District Court five days after the mistrial. UPS filed a motion for sanctions, and in October 2010 the District Court ordered the case dismissed with prejudice to sanction Bull's conduct. This appeal followed.

II.

A.

The District Court ruled that Bull's failure to produce originals of the medical notes was spoliation and it invoked its inherent authority to order the case dismissed with prejudice as a sanction. *See Schmid v. Milwakee Elec. Tool Corp.,* 13 F.3d 76, 78 (3d Cir. 1994).[4] Two questions arise: first, generally, whether the production of facsimiles and copies—in place of the originals—can be considered spoliation; and, second, whether Bull's specific acts or omissions in this case provided a reasonable basis to rule that she spoliated evidence, warranting dismissal with prejudice. Sanctions for spoliation of evidence are reviewed for an abuse of discretion. *In re Hechinger Inv. Co. of Delaware, Inc.,* 489 F.3d 568, 574 (3d Cir. 2007).

B.

---

[4] We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

9

We first look at whether, generally, failing to produce original documents can be considered spoliation. Spoliation is usually referenced in instances where evidence has been altered or destroyed. *See Micron Technology, Inc. v. Rambus Inc.,* 645 F.3d 1311, 1320 (Fed. Cir. 2011) (Spoliation occurs when evidence is destroyed or altered, or when a party fails to preserve evidence in instances where litigation is pending or reasonably foreseeable.). We have described it more broadly. For instance, in a context not involving a mistrial or dismissal, but while discussing a district court's decision to instruct the jury with an adverse inference for spoliation, we said the following:

> When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's *nonproduction* or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him. *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir.1983); *United States v. Cherkasky Meat Co.*, 259 F.2d 89 (3d Cir. 1958).

*Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) (emphasis added). Indeed, a party's failure to produce a document can have the same practical effect as destroying it and we reaffirm that, under certain circumstances, nonproduction of evidence is rightfully characterized as spoliation.

10

Here, though Bull failed to produce the originals, she did provide UPS with facsimiles and photocopies of the documents. The District Court concluded that, in spite of producing copies, Bull's conduct was spoliation because, although UPS had not requested a forensic analysis of the originals, such tests might have yielded information directly relevant to the question of whether the documents were authentic. Such an analysis might not be possible on just copies. We are persuaded that, in some instances, original documents might yield relevant evidence that is simply not available from copies. As a result, we conclude with the District Court that—theoretically—producing copies in instances where the originals have been requested may constitute spoliation if it would prevent discovering critical information. With that said, we reach a very different conclusion when we turn to the question of whether spoliation occurred here.

## C.

Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party. *Id.*[5] Two

---

[5] The District Court essentially merged its deliberation on spoliation with its analysis of spoliation *sanctions*. Though there is some overlap between the two, there are distinctive elements of each. We are focusing upon the spoliation analysis first. However, we note that the sanctions analysis includes the following factors: "(1) the degree of fault of the

11

of these factors pose little controversy in this case. There is no question that the documents were in Bull's control since she admitted this on the stand and produced the documents five days after the District Court declared the mistrial. We also have no doubt that the Farber notes were relevant to both the claims and defenses of this case since the notes discuss a central issue in this case: Bull's capacity to work. The remaining factors, though, merit closer attention.

## D.

With regard to whether Bull intentionally withheld the original notes from Dr. Farber's office, the District Court summarized the facts upon which it made its decision:

> Although Plaintiff would have this Court believe that originals of the documents in question were never requested during discovery, that contention is disingenuous in light of the record, which documents that at least as early as September 27, 2006, Defendant UPS had requested "that Ms. Bull produce the original notes from Dr. Farber's office . . . ."

---

party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid*, 13 F.3d at 79.

The District Court also said "despite numerous requests, both formal and informal, to produce the disputed documents, Plaintiff never responded." As a result, the District Court concluded that:

> Common sense and reasonableness in light of this record, and the numerous and repeated references to the fact that Plaintiff never accounted for the absence of the originals, point to nothing less than purposeful withholding of critical evidence that can not [sic] be countenanced or overlooked by this Court.

Although a District Court has discretion to draw inferences from the record on a party's intent, it strays beyond the bounds of its discretion when, as here, there is no factual basis to do so. The central problem is that the District Court accepted, without any critical examination, misrepresentations of the record promulgated by UPS.

We start with the District Court's foundational premise: UPS hounded Bull for the originals over the course of years, but got no response.[6] To the contrary, we count a

---

[6] UPS misstated as fact the following to the District Court: "We have documented letters asking for the originals." ECF No. 56-4, 23:4-5. "I have never been able to get the originals because they won't give them to me. . . ." *Id.* at 24:7-9. "I sent the trial subpoena. It was very clear I want the originals

13

total of only two requests by UPS for the original documents in the entire span of this case—dating back to pre-litigation communications—and neither of these inquiries were discovery requests.[7]

The first communication was UPS's September 27, 2006, pre-litigation letter requesting the originals. This letter was addressed to Bull's union representative, not Bull. UPS dismisses the distinction because—it says—they have sworn testimony from the union representative that he told Bull that UPS wanted the originals. The representative made no such statement. He only requested that Bull provide new notes, new information, or maybe better or clearer copies.[8] The

---

of the notes. Why - -  and we have Rule 26, we have all of these things, and I still don't have it, and now we're three days into trial." *Id.* at 37:22-25. "I don't know what to do here, Judge. We go through three days of trial. I asked for the originals notes. I sent a valid subpoena. She apparently has had them for three years, four years." *Id.* at 45:23-46:1.

[7] UPS's request for production of documents in this case asked for "copies of the documents described herein . . . ." It did not request originals of these documents.

[8] The full text of this portion of the Cherney deposition is as follows:

Q.	Did you ask or attempt to get *better copies* of the notes for UPS in response to [UPS's request]?
A.	Yes, I did.

union representative knew that UPS wanted the originals, but we have no evidence that Bull knew, and we do not have any basis to impute the union representative's knowledge of UPS's request to Bull.

It does not end there, however. UPS also repeatedly stresses that, from the beginning of discovery, Bull had the September 27 letter from UPS. The implication is that Bull knew about this pre-litigation request for the originals at least by the early phase of this litigation. Although it may be

---

Q.     Do you recall what you did response to that?
A.     Can you repeat the question?
Q.     Sure. I asked you what did you do to get better copies of the notes or words to that effect. You said yes you did. I'm asking did you go to Ms. Bull and ask her to get something, did you go to Dr. Farber? What did you do?
A.     I had conversations with Laureen in effect that there was issues with ambiguities with the note and that to further clarify it, to get notes that - - a note that would release her back to full duty.
Q.     Did you talk to her about the fact that the notes in some cases were - - or the company felt that there was some illegible parts of the notes or that they were blurry and we needed *clearer copies*?
A.     Yes.

Robert Cherney Deposition, 57:14-58:12 (emphasis added).

15

technically accurate to say that the letter was in Bull's constructive possession, UPS fails to note that it produced the letter in response to Bull's general discovery request. Producing such a letter to Bull in response to her general requests for documents is not the same thing as presenting Bull with a specific discovery request for the original notes from Dr. Farber's office. Moreover, we would expect that— had UPS intended this letter to result in Bull turning over the original notes in question—it would have made at least some attempt to pursue their production when they did not materialize. Yet, UPS never raised the nonproduction of the originals in a motion to compel, or in any other communication. As a result, any assertion that the pre-litigation letter of September 27, 2006 to the union representative put Bull on notice of UPS's request for originals fails.

UPS's second request for the originals came on March 3, 2010—five days before trial commenced—in the form of an email. Though UPS refers to it as a trial subpoena, the District Court noted that it did not meet the requirements of Fed. R. Civ. P. 45. We agree. Indeed, there is no evidence that the document that UPS calls a subpoena was issued by the court. As such, given that discovery was closed and that the email is not a subpoena, we cannot treat this communication as anything more than a reminder to Bull's counsel that, at trial, the best evidence rule would apply to the notes from Dr. Farber's office. Moreover, the record does not contain any evidence that Bull was ever aware of this email. Therefore, like the September 27, 2006 letter, the email fails to provide support for an inference that Bull knew of UPS's request and still inadvertently or intentionally withheld the original notes from them.

16

We conclude from this that the District Court was flatly wrong when it declared that UPS made "multiple" requests of Bull for the original notes. We must also conclude that any inference of Bull's intent to obstinately withhold the originals also fails for a lack of any factual foundation that she actually knew UPS wanted them.

The District Court also makes much of UPS's challenge to the authenticity of the Farber notes in its motion for summary judgment, in a pretrial motion, and during its opening argument. It infers that Bull should have understood from UPS's challenge to the authenticity of the notes that UPS wanted and needed the originals. However, these, alone, imply no such thing. It is largely counsel's role to assess which evidence best serves the case. It was up to UPS's counsel to press for the originals if it needed them, and it was up to Bull's counsel to diligently investigate all possible sources for the originals if he needed them to rebut the argument. If neither counsel pressed Bull for the originals to make their case, we cannot impute to Bull a sophisticated knowledge of trial strategy. Indeed, it is obvious from UPS's arguments at sidebar that it was content to try the case with the copies. Moreover, UPS's challenges to the notes' authenticity were largely confined to information that was readily available on the note copies. Bull, and her counsel for that matter, had no reason to place a high priority on locating the original notes.[9] Therefore, without anything else, Bull could not be deemed to be "on notice" that UPS wanted or needed the originals merely from their authenticity argument.

---

[9] *See supra* notes 1 and 2.

17

Moving beyond UPS's requests for originals, the District Court references a statement made by Bull's counsel at trial as a basis to infer her intent. In the instant after Bull revealed that the original notes from Dr. Farber's office were likely in her possession, her counsel said:

> Your honor, I understand what she just said. I've been asking her for the originals since the very beginning when Mr. Bissinger [UPS's counsel] has been asking me for the originals. She just kept telling me that she doesn't have them, she's looked for them but she doesn't - - can't find those notes anymore, they don't exist any more [sic].

ECF No. 56-4, 28:12-17. Bull disputes any memory of this request, and her attorney has moved away from saying that he made multiple requests of Bull.[10] Yet, even if we accept counsel's version of events as told at trial, we do not see how this exchange between counsel and client can be used to ground a conclusion that Bull committed, as the District Court said, "flagrant violations of the most basic code of judicial propriety and honest dealing." Absent the backdrop of UPS's unsubstantiated portrayal of Bull as an obstinate stonewaller, this conclusion is dramatically overblown.

---

[10] *See supra* note 3.

This is not to say that we take Bull's failure to turn over the originals to her counsel lightly.  To be sure, Bull put her counsel in a terrible position.  Her counsel represented in a side-bar to the District Court—moments before her open-court revelation—that "we don't have  - - it [the Farber note original] doesn't exist any more. All we have is a copy." ECF No. 56-4, 21:24-25.  He also unwittingly violated the best evidence rule.  Fed. R. Evid. 1002.  There is no question that the late revelation concerning the originals had impacts.

The key issue, however, is whether the discrepancy between her statements (if in fact there is a discrepancy) was an intentional misrepresentation or—as her counsel insists—inadvertence.  The record does not answer this question.  To be sure, the District Court was remiss in its failure to examine this issue more closely and in its failure to make findings of fact on inadvertence and misrepresentation.  Yet, mindful that it is UPS's burden to prove Bull's bad faith conduct, there are strong reasons favoring a presumption of inadvertence.

Counsel attempted to examine Bull on the record before the mistrial was declared to get her explanation for her late revelation, but the District Court inexplicably would not allow it.[11]  There is no evidence that either Bull or her

---

[11] Bull's counsel said at sidebar:

Bull's Counsel:  I would like to pursue [the reason for Bull not searching for the Farber notes] with Ms. - - and see if there can be a clarification with her that you can ask her questions and she can explain.  You asked her a question and she gave you a one-word response, okay? Maybe there's more to it that would clarify."

counsel wished to be anything less than candid about this topic. They were simply prevented from doing so by the District Court who passed up the opportunity to take testimony and make findings of fact. Moreover, Bull's counsel stated emphatically in oral argument that Bull did not lie to him about the originals, seemingly ruling out bad faith. Since the entire case for Bull's bad faith seems to rest on counsel's words, we must take all of his words on the topic into account, including these. Moreover, even if Bull did obfuscate on the request from her attorney (a conclusion that ignores Bull's counsel's statements, and the later representations made by Bull to her counsel), there is still no evidence that Bull knew UPS wanted the originals, since she had already produced copies. In light of UPS's utter failure to produce any evidence of its own to ground the conclusion that Bull acted in bad faith, all of this supports abiding by a presumption of inadvertence.

We must keep in mind that at issue is whether the District Court was reasonable in ruling that Bull's late revelation about the existence of the originals was a "flagrant violation" and that there is:

> [N]o plausible explanation other than Plaintiff's misconduct that explains the withholding of the original Farber notes. Despite

---

The Court: No, she gave me a one-word response. Yes, I have it, it's at home, and "I've never even tried to find it."

ECF No. 56-4, 42:6-13.

20

> numerous requests both formal and informal, to produce the disputed documents, Plaintiff never responded.

On this point, our review of the record has left us with a very different set of conclusions from the District Court. First, we do not see any basis for the District Court's characterization of UPS as persistently hounding Bull for the originals. Indeed, it did not. Second, as a result of this, there is not one instance in which we can verify that Bull actually knew that UPS wanted the original notes. Third, lacking such evidence there is no basis to characterize Bull as one who lied or obfuscated to prevail in her attempt to intentionally withhold the originals. We conclude from all of this that the District Court abused its discretion in ruling that, within its spoliation analysis, Bull intentionally withheld the original documents from UPS.

### E.

We turn, finally, to the issue of whether Bull had a foreseeable duty to preserve and turn over the originals of the notes from Dr. Farber's office. The Court of Appeals for the Federal Circuit said that the question of reasonable foreseeability is a "flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Micron Technology, Inc.*, 645 F.3d at 1320. Here, the District Court ruled that "it is hard to imagine evidence that could have been more . . . foreseeable." We conclude that the District Court was within its discretion when it

determined that there was a foreseeable duty here, but we have some reservations.

The record is scattered with support for the District Court's conclusion. 1.) Bull initiated both an EEOC proceeding and the instant litigation within a year of UPS's employment action. 2.) Bull was aware that she and UPS fundamentally disagreed on the meaning of the notes from Dr. Farber's office. 3.) Though she denies it, her counsel says that—on at least one occasion—he asked her for the originals. 4.) Both UPS's motion for summary judgment and a pre-trial motion mention the fact that UPS had never seen the originals. UPS also raised this fact in its opening argument. 5.) Finally, Bull had a duty under Rule 1002 of the Federal Rules of Evidence to produce the original documents before the notes could be introduced into evidence at trial.

With that said, the duty issue is not so clear cut. We lack evidence that counsel for either party made any appreciable effort to induce Bull to search for and produce the original Farber notes. Moreover, it is clear that UPS's challenge to the authenticity of the notes rested upon information that was available on the copies of the documents. This leads us to wonder whether a lay-person like Bull, ignorant of the Rules of Evidence, might have concluded that copies of the notes were sufficient.

Nonetheless, the question before us is not whether a particular scenario is possible, but rather whether the duty was objectively foreseeable. Under the circumstances of this case, we will assume that the District Court acted within its discretion in determining that the litigation and the future

need to provide access to the original notes from Dr. Farber's office were foreseeable.[12]

F.

---

[12] This highlights a growing concern for us that is not directly implicated in this case. As electronic document technology progresses, the concept of an "original" document is becoming more abstract. Moving from the more easily distinguishable photocopy or facsimile to documents created, transmitted and stored in an electronic form means that it will be increasingly difficult to ascertain where the boundary of an objectively reasonable duty to preserve such documents lies. There are—and increasingly will be—circumstances in which the foreseeability of a duty to preserve the information contained in a particular document is distinguishable—under an objective analysis—from the need to preserve that information in its "original" form or format. Indeed, arriving at a common understanding of what an "original" is in this context is challenging enough. Although it does, and always will rest with the courts to preserve the distinction between an objectively foreseeable duty and actual knowledge of such a duty, there is a concomitant obligation that counsel must assume to clearly and precisely articulate the need for parties to search for, maintain, and—where necessary—produce "original" or source documents. This case gives us one more opportunity to highlight our position that clarity in communications from counsel that establish a record of a party's actual knowledge of this duty will ensure that this technology-driven issue does not consume an unduly large portion of the court's attention in future litigation.

In summarizing the *Brewer* spoliation factors, we conclude that the District Court was within its discretion in determining that Bull had the original notes from Dr. Farber's office in her possession, that these documents were relevant to the case's claims and defenses, and we will assume that she had a reasonably foreseeable duty to preserve and—when requested—turn-over these documents. Yet, we conclude that the District Court abused its discretion in determining that Bull intentionally withheld these documents from UPS.

In *Brewer* we discussed the connection between a finding of sanctionable spoliation and a ruling on bad faith, stating the following:

> For the [spoliation] rule to apply . . . it must appear that there has been an actual suppression or withholding of the evidence. *No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for. See generally* 31A C.J.S. Evidence § 156(2); 29 Am.Jur.2d Evidence § 177 ("Such a presumption or inference arises, however, only when the spoliation or destruction [of evidence] was intentional, and indicates fraud and a desire to suppress the truth,

> and it does not arise where the destruction was a matter of routine with no fraudulent intent.").

*Brewer,* 72 F.3d at 334 (emphasis added). Therefore, a finding of bad faith is pivotal to a spoliation determination. This only makes sense, since spoliation of documents that are merely withheld, but not destroyed, requires evidence that the documents are actually withheld, rather than—for instance—misplaced. Withholding requires intent.[13]

As a result, we must be convinced that the District Court, on sufficient evidence, found that Bull intended to actually withhold the original documents from UPS before we can conclude that sanctionable spoliation occurred. There is no such finding of record here. As we have concluded that the District Court abused its discretion in ruling that Bull acted in bad faith, we must rule that the District Court abused its discretion in determining that Bull committed sanctionable spoliation. Accordingly, the District Court's sanction of dismissal with prejudice, which is grounded in the conclusion that Bull spoliated evidence, is also an abuse of discretion.

III.

---

[13] We note that the verb "withhold" is defined as "To keep from doing something, to keep in check or under restraint; to hold back, restrain." Oxford English Dictionary. http://www.oed.com/view/Entry/229665?redirectedFrom=withhold#eid, last viewed December 5, 2011. It inherently expresses an intentional act.

A.

Our decision to reverse the District Court's ruling on spoliation eliminates the need for a specific review of the District Court's sanction of a dismissal with prejudice, since it arose from its determination that Bull spoliated evidence. Yet, the District Court's rationale for the sanction contained in its opinion differs markedly from its analysis when it granted the mistrial and invited a motion for sanctions. When it granted the mistrial, the District Court based its decision on a perceived discovery violation that it characterized as spoliation. In its opinion it retreats from that basis and instead relies on its inherent power to sanction. The inherent power of the District Court to sanction parties' conduct is, of course, not limited to instances of spoliation. Therefore, in an abundance of caution, we will review the record to ascertain whether the circumstances of this case, generally construed, provide any basis on which the District Court could substantiate dismissing the case with prejudice.

Generally, "[w]hile we defer to the District Court's discretion, dismissal with prejudice is only appropriate in limited circumstances and doubts should be resolved in favor of reaching a decision on the merits." *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002). Dismissals with prejudice are "drastic sanctions." *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 867 (3d Cir. 1984). Moreover, district courts ordinarily balance six factors in assessing the propriety of an involuntary dismissal with prejudice: "(1) the party's personal responsibility; (2) the prejudice to the adversary; (3) a history of dilatoriness; (4) willfulness or bad faith; (5) the availability of alternative sanctions; and (6) the merit of the claim or defense." *Doe v. Megless*, 654 F.3d

26

404, 411 (3d Cir. 2011) (citing *Poulis*, 747 F.2d at 868). As the District Court acknowledged, some of the *Poulis* factors duplicate the spoliation analysis. Nonetheless, we will review each one separately.

B.

We begin by looking at Bull's personal responsibility for withholding these documents. As we noted earlier, the District Court concluded that there is:

> [N]o plausible explanation other than Plaintiff's misconduct that explains the withholding of the original Farber notes. Despite numerous requests, both formal and informal, to produce the disputed documents, Plaintiff never responded.

As we already detailed, however, the District Court's inference that Bull intentionally withheld documents is not grounded in the record. Although Rule 1002 placed responsibility for producing the originals with Bull and her counsel, negligence remains a reasonable explanation for everything that happened. The same can also be said for her possible misrepresentation of the documents' whereabouts to her attorney. The record simply does not have evidence, nor a factual finding supporting bad faith intent. Moreover, had the District Court found bad faith conduct on this evidence, it would have clearly erred. This leads us to conclude that, though the personal responsibility factor of the *Poulis* analysis must weigh against Bull because of the duty she had

27

under Rule 1002, this factor cannot be given great weight because there is neither evidence of, nor a finding that she intended to withhold the documents.

## C.

The District Court concluded that the next factor, prejudice, also weighed heavily in favor of dismissal. It said:

> Had Defendant been able to prove that the document was tampered with, that would obviously have had significant bearing on the case. The fact that [UPS] could not conduct forensic analysis on the original was certainly prejudicial, even if the outcome of such an analysis remains unknown.

It also ruled that this, combined with the costs of trial preparation and UPS's inability to account for the originals in the development of its trial strategy, resulted in "significant prejudice."

Examples of prejudice are "the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party." *Scarborough v. Eubanks*, 747 F.2d 871, 876 (3d Cir. 1984). We have also said: "'prejudice' for the purpose of *Poulis* analysis does not mean 'irremediable harm,' the burden imposed by impeding a party's ability to prepare effectively a full and complete trial

strategy is sufficiently prejudicial." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 222 (3d Cir. 2003).

Certainly, the lack of access, coupled with UPS's unreimburseable costs of preparing for trial, and the disclosure of UPS's trial strategy all support the District Court's use of its discretion in ruling that UPS suffered prejudice. For this reason, we conclude that the District Court did not abuse its discretion here.

Again, however, we are dubious about the District Court's characterization of the prejudice as "severe" and "irreparable," since we do not know the probative value of the originals (as compared to the copies) and are puzzled by UPS's lackadaisical effort in obtaining them—given how critical they now say they were to their case.

D.

With regard to dilatoriness, the District Court ruled that it "weighs extremely against Plaintiff." Yet, as we addressed above, there is no evidence that Bull was ever aware that UPS specifically requested the Farber note originals. Moreover, the first request that UPS made for the documents during the litigation was literally on the eve of trial. As a result, we do not find any reasonable basis for the conclusion that Bull was dilatory as to the production of the originals to UPS.

With regard to her attorney, we must rely on counsel's representations that the delay between his own request for the original documents and her production of them five days after mistrial was due to inadvertence or misunderstanding. On

29

this basis, we cannot characterize her conduct as dilatory because there is no evidence of a willful delay.

E.

The fourth factor, bad faith, already has been discussed in detail above. Suffice to say, in spite of the District Court's strong, negative characterization of Bull on this element, we conclude that there is not a reasonable basis in the record to conclude that she willfully withheld the documents or that her conduct was in bad faith.

F.

With regard to the availability of lesser sanctions, the District Court said that it had considered them "long and seriously," but, ultimately, concluded that anything less than dismissal with prejudice would "condone flagrant violations of the most basic code of judicial propriety and honest dealing." It went on to say: "[a] sanction other than dismissal would be insufficient to remedy the prejudice caused by Plaintiff's intentional withholding of evidence and failure to provide appropriate notice to Defendant." Finally, it concluded that "there is no way around the fact that Plaintiff's conduct has irreparably prejudiced Defendant." There are numerous problems with this conclusion.

As we already have said, the record does not support a ruling that Bull intentionally withheld documents, nor that she was conducting herself dishonestly in this litigation. Moreover, any prejudice arising from UPS's lack of access was remediable because UPS could have obtained the originals five days after the mistrial was declared.

30

Second, before the District Court declared a mistrial, UPS originally argued against a mistrial and strongly advocated that the District Court remedy the situation by barring Bull from introducing the originals into evidence.[14] Unlike *Ware,* where the exclusion of evidence necessitated a dismissal of the claim, the originals comprised only a portion of the evidence and UPS was—at least originally—content to proceed with trial using the copies of the notes that UPS had always had in its possession.

Finally, though the District Court rejected an adverse inference instruction as an appropriate remedy, it gave no solid reason for this. In light of the fact that such an instruction would have bolstered the very portion of UPS's case that it says suffered because it lacked the originals, we fail to see how an adverse inference—though itself a severe sanction—would not have been preferable to a dismissal with prejudice. Given that dismissal with prejudice is a remedy of last resort, we are puzzled by the District Court's decision.

For all of these reasons, we conclude that justification for the dismissal was overblown, and that sanctions other than

---

[14] UPS made the following statements at sidebar, following the discovery of the Farber originals. "I'm fine with this jury. I don't know that we need a mistrial, Your Honor. But using this note is - - is clearly - - I don't know what to do." ECF No. 56-4, 34:18-20. "I still say, Judge, the appropriate remedy is to let the jury rely upon what UPS relied upon." *Id.* at 38:1-2. "I think the appropriate remedy again is to allow the trial to proceed with the faxed versions of the notes." *Id.* at 42:25-43:1.

dismissal with prejudice were available to adequately address any impacts suffered by UPS and the judicial process. The District Court abused its discretion in concluding that dismissal with prejudice was the only appropriate remedy.

## G.

Finally, in assessing the sixth *Poulis* factor, the District Court concluded that the merits of Bull's claim are "utterly lacking." Yet, the District Court appears to have misunderstood the subject of this portion of the analysis to be Bull's defense against sanctions. *Poulis* directs the District Court to examine the merits of the underlying claim: which, in this case, would be Bull's employment discrimination claim. *Poulis,* 747 F.2d at 869-70. Moreover, even if the discrimination claim was judged to be meritless, Bull also advanced a second claim of workplace harassment that rested on a factual foundation that is distinct from the Farber notes. For all of these reasons, we conclude that the District Court abused its discretion in concluding that this factor weighed in favor of dismissal because it did not even address the merits of Bull's claim.

## H.

To summarize, then, we conclude that two of the *Poulis* factors—personal responsibility and prejudice—weigh in favor of dismissal and four factors—dilatoriness, bad faith, availability of lesser sanctions, and the merits of the underlying claim—weigh against a dismissal. We are left with the question of whether the District Court's decision to dismiss the case with prejudice could be regarded as within its discretion when it is based primarily upon the prejudice

UPS suffered. We conclude that it was an abuse of discretion.

Earlier, we referenced a statement in *dicta* from *Scarborough* in which we provided a list of the types of events that would support a ruling that a party's prejudice alone should result in a dismissal. In that portion of the opinion, we said:

> If there has been true prejudice to a party by its adversary's failure to file a timely or adequate pleading, discovery response, or pretrial statement, that factor would bear substantial weight in support of a dismissal or default judgment. Examples of such prejudice are the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party.

*Scarborough*, 747 F.2d at 876. We acknowledge that this list is exemplary and not exhaustive. Yet, it points to the scenario that we view as typical in a dismissal: the non-responsible party's case is severely impaired because it lacked the information that was not produced. Although UPS had every right to receive the original Farber notes, there is nothing in the record to even suggest that it asked for them in discovery, or that its case was crippled because it lacked them. Moreover, UPS itself suggested early in the deliberations, that

33

sanctions short of mistrial (and therefore short of dismissal) were sufficient to address its prejudice. We conclude from all of this that UPS's prejudice is not sufficiently weighty to support the District Court's sanction of dismissal with prejudice.

Moreover, since all sanctions originate from the realm of equity, we note that UPS's representations to the District Court, and this Court, were less than candid. It is fair to say that UPS expended no small effort in obfuscating to the District Court and this Court the details of its requests for the originals. We acknowledge that it was the District Court's responsibility to plumb the record to learn that UPS did not, as it repeatedly asserted, hound Bull for the originals. Yet, UPS's counsel crossed a line between effective advocacy and its duty as an officer of the court to accurately present the record, and in so doing it encouraged the District Court's misunderstanding of the record.[15]

---

[15] Based upon the following statement at sidebar during trial, the District Court plainly was unaware of the fact that UPS never asked Bull directly for the notes, and that there is no evidence that she was aware of any such request made to anyone else; yet, UPS never made any effort to correct the misunderstanding. "So all they did was in my view what would be a reasonable request. We find out she wouldn't give those [Farber notes] to UPS, she wouldn't give them to the people that are the union leaders that are supposed to be assisting her. Then all discussions stop, a lawsuit starts, and then all of a sudden, after three years of discovery, in the third day of trial, we find out that these may exist but nobody ever looked for them. Now come on. . . .This is egregious." ECF No. 56-4, 49:7-17.

We conclude that, apart from the merits of the appeal, without the benefit of clean hands here, UPS should not be the beneficiary of a sanction that we are, under most circumstances, already loathe to affirm.

## IV.

For all of these reasons, we conclude that the District Court abused its discretion in ordering that Bull be sanctioned by dismissing her case with prejudice. Therefore, we will reverse the order of the District Court and remand the cause for a re-trial.